**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

TYRONE CORNELIUS HILL,

      Defendant-Appellant.

No. 10-6203
(D.C. No. 5:10-CR-00060-F-1)
(W. D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY** and **O'BRIEN**, Circuit Judges.

This is a direct criminal appeal. Defendant-appellant Tyrone Hill was indicted on eleven counts alleging possession of cocaine with intent to distribute and use of a telephone to facilitate a drug crime. After a jury trial, Mr. Hill was convicted on all counts and sentenced to 140 months in prison. Jurisdiction over this appeal is granted to this court by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Hill was arrested and charged as part of an investigation that originally had been centered on an Oklahoma City street gang. Witness One was identified as a significant cocaine dealer in this investigation, and the FBI got a court order to monitor his telephone for several months.[1] Witness One was eventually arrested and agreed to cooperate with law enforcement in their investigation. The Presentence Report (PSR) in Mr. Hill's case lists 51 related cases that were prosecuted around the same time, including those of Witness One and two others who testified for the prosecution in Mr. Hill's trial.

FBI Special Agent Gary Johnson testified that pen registers documented frequent calls between a cell phone used by Mr. Hill and Witness One's cell phone. Those calls occurred between March and July 2009, with a hiatus in June when Witness One had left the state because he had become concerned that an investigator might be following him. Agent Johnson testified that a text message from Mr. Hill to Witness One had been intercepted on June 22, 2009, in which Mr. Hill inquired whether Witness One had returned to the Oklahoma City area and asked in slang terms if Witness One could provide one-half ounce of cocaine.

Witness One testified that he had been introduced to Mr. Hill by Hill's cousin, Donnell Johnson, who had been one of Witness One's customers. Mr. Hill began buying

---

[1]Of the prosecution witnesses at trial, two were persons also indicted as a result of the same investigation. Although these persons apparently were not promised confidentiality, we have redacted their names out of an abundance of caution. We have done the same as to a third government witness, although that person apparently was not charged. The defense did not call any witnesses at trial.

powder cocaine from Witness One at frequent intervals. Witness One testified that he sold twelve ounces of cocaine to Mr. Hill over a nine-month period. (The indictment charged only a three-month period, but the longer period was used in the sentencing process to calculate the quantity of drugs for which Mr. Hill was to be held responsible, as discussed *infra*.) Witness One testified that Mr. Hill always wanted powder cocaine because Mr. Hill wanted to convert the cocaine to crack himself. In his testimony, Witness One made it clear that he was relying on the records of his cell phone use that the prosecution had obtained and reviewed with him for his conclusions that he had sold drugs to Mr. Hill on particular dates. Witness One relied not just on the dates of calls from or to Mr. Hill but also the duration of those calls. In addition, Witness One testified that some days showed several calls within a short period of time, which he said indicated that the two were arranging a meeting for Mr. Hill to buy cocaine.

Witness Two was another witness who, like Witness One, testified as part of a plea agreement with the government. Witness Two testified that she saw Mr. Hill with cocaine in both powder and crack form a number of times and that she had watched him "cook" powder into crack. Another person testifying pursuant to plea agreement, Witness Three, said that he saw Mr. Hill sell powder cocaine to Donnell Johnson (Mr. Hill's cousin) many times and then watched Mr. Hill cook it into crack.

On appeal Mr. Hill raises issues that he groups into three clusters. He challenges: first, the district court's rulings on three pretrial motions; second, the sufficiency of the evidence for conviction and whether the proceedings were fundamentally fair; and third,

the quantity of cocaine attributed to him for purposes of calculating the advisory sentencing range under the Sentencing Guidelines, as well as the ruling that he was responsible for crack cocaine rather than powder cocaine.

## II

Mr. Hill raises issues concerning three pretrial motions filed on his behalf by trial counsel (who is not the same as Mr. Hill's appellate counsel) in the district court.

## A

First, trial counsel filed a motion in limine asking the court to order the prosecution

> to refrain from any mention whatever . . . of the following:
>
>    1.  That the Defendant is or was ever a member of a "gang" or has any knowledge of gang activities;
>
>    2.  That the Defendant is now known by or has ever used a moniker or nickname associated with a "gang".

I R. 13. The district judge reserved ruling on this motion when the matter came up before trial, but the judge also cautioned the prosecution that no references should be made without first alerting the judge so that he could rule in advance before any possibly prejudicial matters were introduced.

The trial was conducted without reference to gangs per se. But a prosecutor did ask Witness One if he knew a person "by the name of T-Bone" without first alerting the judge that she was going to refer to Mr. Hill by this nickname. There was no objection.

Both the prosecutor and Witness One continued to refer to Mr. Hill as T-Bone as that session continued, but at a break in the proceedings counsel for Mr. Hill raised the subject again. The first reference to "T-Bone" appears at page 85 of the trial transcript (III R. pt. 2 at 156), while counsel's reference to the motion in limine appears at page 132 of the transcript (*id*. at 203). This gives an idea of the length of time that passed before counsel raised any issue about the nickname.

More importantly, when counsel did draw the attention of the court to the motion in limine, he made no objection to the fact that the prosecutor and Witness One had been using the nickname quite frequently during Witness One's testimony. Instead, counsel noted that no reference to gang affiliation had been made but said that he thought he should bring the matter up again "to at least make a record . . . ." The trial judge noted that the nickname "T-Bone" had not been linked to gang affiliation but that it still would have been preferable, in light of his prior order, if the prosecution had specifically alerted the court before introducing the nickname. The judge reminded the parties that his prior ruling was in effect, requiring specific approval by him before any gang references were made, and defense counsel indicated no disagreement or discomfort with that state of matters. Consequently, the prosecutors and their witnesses continued to refer to Mr. Hill as T-Bone throughout the trial, without objection.

Mr. Hill's appellate counsel now contends that this was error having enormous prejudicial effect. But based on the record before us, we do not even see an abuse of

-5-

discretion, much less plain error.[2]  There were no gang references at trial, and Mr. Hill

cites no authority for his contention that the fact that he is known to others by a nickname

is inherently prejudicial because a jury will inevitably associate all nicknames with drug

dealers.  Mr. Hill's argument rests only on speculation and is unpersuasive.

Moreover, we do not see that use of the nickname was unduly prejudicial, if it was

prejudicial at all.  Such questions must always be considered in the context in which they

arose.  Here, the jury heard testimony from three witnesses who all reported that Mr. Hill

was a cocaine dealer.  In this context, the use of Mr. Hill's nickname at trial – with no

indication that the nickname was the result of an affiliation between Mr. Hill and a gang –

cannot be said to have had a significant impact on the outcome of the case.

**B**

Trial counsel for Mr. Hill filed a second motion in limine in response to a notice

filed by the prosecution of its intent to introduce, pursuant to Fed. R. Evid. 404(b),

evidence of an altercation involving *inter alia* Mr. Hill and prosecution witness Witness

Three.[3]  The district judge granted the motion, and no mention of the incident was made

at the trial.  Nevertheless, appellate counsel insists that the defense was prejudiced

---

[2]Clearly the issue has at least been forfeited, if not waived.  *See United States v. Olano*, 507 U.S. 725, 733 (1993), for discussion of the difference.  We assume without deciding that the issue was not waived, because Mr. Hill cannot prevail even under that assumption.

[3]In Mr. Hill's opening brief this was not argued as a separate issue but as part of Mr. Hill's argument that the trial was fundamentally unfair.  The government treated it as a separate issue in its response brief, as did Mr. Hill in his reply brief.  We consider it separately in this portion of the opinion for convenience.

because excluding the evidence left the jurors unaware of this possible source of bias on the part of Witness Three. Undeterred by the lack of any authority to support his argument, Mr. Hill contends that the prosecution had a duty to tell the jurors that Witness Three was biased against Mr. Hill. Witness Three's animosity towards Mr. Hill "should have been as quickly brought to the attention of the jury as it brought its 'testify truthfully' document to the attention of the jury,"[4] Mr. Hill's brief says.

The incident to which we have referred involved allegations that Mr. Hill and another had physically assaulted Witness Three. The reason for the assault allegedly was that Witness Three was believed to have "set up" persons associated with Mr. Hill, who had been robbed of drugs. The record reveals some confusion about whether Mr. Hill was present when the robbery occurred, but that seems quite unimportant in the overall context. The record shows that Mr. Hill was arrested on assault charges. Mr. Hill's trial counsel evidently made a tactical decision that evidence of the incident that allegedly caused Witness Three to be biased against Mr. Hill was likely to do more harm than good for the defense. We see no basis for us even to review that decision on direct appeal, much less to conclude that it was a decision so misguided as to call into question the fairness of the proceedings.

Under the invited error doctrine, Mr. Hill cannot complain that the district court granted his counsel's motion. *See United States v. DeBerry*, 430 F.3d 1294, 1301-02

---

[4]The reference to a "testify truthfully" document is to the plea agreements of Witness One and Witness Two, agreements that required them to testify truthfully.

("[T]he invited-error doctrine precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt."). Mr. Hill cites no authority for his contention that the prosecution was nevertheless obligated to ensure that the jurors knew that Witness Three had some animosity towards Mr. Hill, and we are not aware of any such authority.

## C

The third pretrial motion addressed in Mr. Hill's brief was a motion to compel the prosecution to produce all statements made to investigators by Witness One, "with the Rule 11 hearing statements,[5] and such other documents unknown to this Defendant that should be provided." Supp. R. at 23. The record indicates that the district court heard arguments on the motion before denying the motion in a minute order. In that order, the court stated: "After the court's review of unredacted copies of the material sought, the court rules that there is no discoverable material that has been redacted and not produced." I R. 30.

In spite of the fact that the district court order recites that the judge had reviewed "the materials sought," Mr. Hill asserts that there must have been other materials subject to the motion that the judge had not reviewed. Other than this, no actual argument is presented in the opening brief.

---

[5]Under Fed. R. Crim. P. 11(b), before accepting Witness One's plea of guilty, the district judge was obligated to engage in a colloquy with Witness One. Among the topics the rule requires to be discussed are what, if any, promises had been made to Witness One and whether there was a factual basis for the guilty plea.

On this record, we see no basis for Mr. Hill's assertion that the district judge failed to review all sought materials, nor any basis for concluding that the materials contained potentially exculpatory material contrary to the district judge's explicit statement. In short, we see neither error nor abuse of discretion.

**III**

Mr. Hill next argues that the evidence was insufficient to support the jury verdict of guilty beyond a reasonable doubt. The record does not show whether a motion for judgment of acquittal was made at the close of the evidence. Because we conclude that Mr. Hill's argument is without merit in any event, we will apply our usual *de novo* standard of review.

Mr. Hill's argument is primarily an attack on the credibility of the prosecution's witnesses and as such carries little weight on appeal. Mr. Hill does also rely on the lack of physical evidence. Neither drugs, nor cash, nor drug paraphernalia was introduced in evidence at trial. Moreover, even though the government had recorded many telephone calls between Mr. Hill and Witness One, none were introduced in evidence. Only one text message was introduced.

Nevertheless, the testimony of the government's witnesses was plainly sufficient to support the conviction. Credibility of witnesses is of course a matter for the jury's determination, and "we will overturn a jury's credibility determination . . . only if the testimony is inherently incredible – that is, only if the events recounted by the witness were impossible under the laws of nature or the witness physically could not have

possibly observed the events at issue." *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010) (internal quotations omitted).

Mr. Hill makes an attempt to bring his challenge within the above-quoted standard by asserting that the testimony of Witness Two recounted something "impossible under the laws of nature." The reference is to Witness Two's attempt to describe the process by which she said that she saw Mr. Hill convert powder cocaine into crack. But Witness Two testified only to her recollection of what she had observed; she did not purport to be an expert, nor did she claim to have the ability or inclination to conduct the process herself. Thus, if Witness Two's testimony failed to describe the process fully and accurately, it could be because she failed to observe or failed to remember every step in the process. She did not testify that she had any other knowledge about the process other than what she had seen. When the evidence is viewed in the light most favorable to the jury verdict, as we must view it, the fact that Witness Two may not have described the process with total accuracy does not make her testimony scientifically impossible, but merely subject to human error.

Mr. Hill also contends that the prosecution engaged in impermissible "vouching" when it had Witness One and Witness Two testify that their plea agreements required them to testify truthfully. We rejected the same argument (on plain error review as we must employ here) in *United States v. Magallanez*, 408 F.3d 672, 681-82 (10th Cir. 2005). We concluded our analysis of the issue in *Magallanez* with this observation, which is equally applicable in this case: "The prosecutor did no more than reveal the

language of the plea agreements and the obligations within those agreements to testify truthfully. Such actions are not prosecutorial misconduct." 408 F.3d at 682.

Mr. Hill also asserts that his trial was fundamentally unfair. The brief invokes the doctrine of structural error, but without any analysis or authority to sustain the inherently dubious proposition that this trial was infected with structural error. We reject these unsupported contentions. Finally, Mr. Hill suggests that he was abandoned by his lawyer at trial. We are not persuaded. Counsel cross-examined the prosecution's witnesses and highlighted the motives of the witnesses who testified under plea agreements. Counsel filed three pretrial motions, as discussed *supra*. Because we cannot agree that Mr. Hill was denied all assistance of counsel, any claim that counsel was constitutionally ineffective should be raised in collateral proceedings as per our general rule. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc).

### IV

Mr. Hill also challenges the quantity of cocaine attributed to him for calculation of the advisory guidelines range, as well as the decision to hold him responsible for crack cocaine rather than powder cocaine.

As to the type of cocaine for which Mr. Hill was held responsible, Mr. Hill cites no authority for his contention that it was improper to sentence him on the basis of crack cocaine, and under the circumstances of this case we are aware of no such authority. Witness One testified at trial that Mr. Hill sought powder cocaine so that he could convert it to crack himself. Two witnesses testified to having seen Mr. Hill convert powder to

-11-

crack, and each of them witnessed that on more than one occasion. In light of this evidence, the district judge at sentencing was emphatically clear in his rejection of the defense argument: "I have no trouble at all finding that this defendant was very much in the crack cocaine business. It was not a mater of foreseeability, it's a fact. He was in the crack cocaine business." III R. pt. 1 at 35. With that finding, the district court was on solid legal ground in basing the sentence on crack rather than powder cocaine. *See United States v. Angulo-Lopez*, 7 F.3d 1506, 1511 (10th Cir. 1993), *superseded on other grds., United States v. Kissick*, 69 F.3d 1048, 1053 (10th Cir. 1995) (*abrogated on other grds*, *United States v. Horey*, 333 F.3d 1185, 1187-88 (10th Cir. 2003)).

As to the quantity of crack cocaine for which Mr. Hill was held responsible, the district court relied on the testimony of Witness One to find that a conservative estimate of the quantity was 12 ounces of powder cocaine. The offense level under the Guidelines for that amount of crack cocaine is 32, which the PSR recommended and the district court adopted. We note that this level is prescribed for quantities from 150 grams to 500 grams. U.S.S.G. § 2D1.1(c)(4).[6]

---

[6]We have not found an explanation for the district court's apparent finding that the amount of crack cocaine for which Mr. Hill was responsible was the same amount as the amount of powder cocaine that Witness One testified to having sold to Mr. Hill. We consider, *sua sponte*, the possibility that there was no such finding. If there were such an error, we are convinced that it was harmless. As noted in the text, the minimum quantity for application of the offense level of 32 was 150 grams, while the amount of powder on which the district court based its ruling was 12 ounces or approximately 336 grams.

Therefore, as long as the process of converting the powder to crack yielded at least one-half of the amount of powder used, the result would not be changed when the 12 ounces of powder was multiplied by a number representing the approximate yield from

(continued...)

We review the district court's findings of fact in the sentencing process only for clear error, and we see no error here.

## Conclusion

The convictions and sentence are AFFIRMED.

**IT IS SO ORDERED**.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge

---

[6](...continued)
the process.  As to the yield, there was testimony at trial that one ounce of powder could yield almost an ounce of crack, even assuming, as Witness One did (based on what Mr. Hill had told him), that Mr. Hill was not adding significant weight in the process by using a cutting agent.  Witness One testified that Mr. Hill expected to get 26 to 28 grams of crack from an ounce of powder.  *See* III R. pt.2 at 162, 198.